# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0328

═══════════

Tracy Windrum, Individually, and on Behalf of her Minor Children, B.W., J.W., and H.W., Petitioner,

v.

Victor Kareh, M.D., Respondent

═══════════════════════════════

On Petition for Review from the
Court of Appeals for the First District of Texas

═══════════════════════════════

**Argued October 10, 2018**

Justice Green delivered the opinion of the Court, joined by Chief Justice Hecht, Justice Guzman, Justice Lehrmann, Justice Boyd, Justice Devine, and Justice Blacklock, and in which Justice Brown joined as to Parts I–III.

In this wrongful death case, we must determine whether: (1) the expert testimony was conclusory such that the jury could not rely on it to conclude that a neurosurgeon was negligent in breaching his standard of care by failing to treat his patient properly; (2) the defendant's negligence was too remote to be a proximate cause of the plaintiff's death; and (3) the court of appeals erred in applying the factual sufficiency review standard. We hold that: (1) the expert testimony was not conclusory; (2) the defendant's negligence was not too remote to be a proximate cause of the plaintiff's death; and (3) the court of appeals erred in deciding factual sufficiency without explaining its application of the standard. We reverse the court of appeals' judgment and remand the case to that court.

## I. Background

### A. Factual Background

Forty-six-year-old Lance Windrum took his three children to Buc-ee's on February 3, 2010. In the parking lot, he suddenly became disoriented and confused, and his speech was slurred. At some point, he hit his head while getting into his car. An ambulance took him to North Cypress Medical Center (NCMC), where the emergency room physician, Dr. Carrie Blades, ordered a computerized axial tomography (CAT) scan of his brain. Shortly thereafter, Lance had a magnetic resonance imaging (MRI) scan, and then the emergency room doctors referred him to Dr. Harpaul Gill, a neurologist at NCMC. Lance tested positive for Benzodiazepines, which are drugs that could have caused some of Lance's symptoms, including his slurred speech. Lance reported to Dr. Gill that he had experienced three similar episodes in recent months, with each resolving in a matter of minutes. His previous episodes were mild compared to this episode. During the third episode, which occurred in December 2009, Lance felt confused, he had tremors in his hand and leg, and his balance was impaired. The symptoms subsided within minutes. Lance also reported that when he was six years old, he contracted encephalitis, a brain infection.

After reviewing the MRI results, Dr. Gill determined that the lateral and third ventricles of Lance's brain were markedly dilated out of proportion, with narrowing of the aqueduct. This indicated that Lance had aqueductal stenosis. The lateral and third ventricles of the brain produce cerebrospinal fluid, which travels through an aqueduct into the brain's fourth ventricle. Aqueductal stenosis is the narrowing of the aqueduct through which cerebrospinal fluid travels through the brain, and it can cause hydrocephalus.

2

There are two types of hydrocephalus: (1) communicating hydrocephalus, and (2) obstructive (non-communicating) hydrocephalus. Communicating hydrocephalus is associated with chronic, on-and-off increased intracranial pressure and does not require a shunt. Obstructive hydrocephalus, which is non-communicating hydrocephalus shown by acute pressure changes, has three categories: partially obstructed, totally obstructed, and compensated obstructed. Obstructive hydrocephalus occurs when the brain is compensating for increased intracranial pressure due to a partial or full blockage of the aqueduct, and a shunt is usually inserted to alleviate the pressure. There are two main options for treating hydrocephalus: insert a shunt, or conduct a third ventriculostomy, a procedure similar to inserting a shunt that reopens a pathway for spinal fluid to pass.

On February 3, 2010, Dr. Gill concluded that Lance had compensated obstructive hydrocephalus due to the aqueductal stenosis, and he told Tracy Windrum, Lance's wife, that a shunt should be inserted the next day.[1] Dr. Gill referred Lance to Dr. Victor Kareh, a neurosurgeon, to determine how to further treat Lance. Dr. Gill told Lance and Windrum that inserting a shunt was a common procedure that would likely be the solution to Lance's symptoms. Windrum left Lance at the hospital that night believing that Lance would receive a shunt the next morning.

Dr. Kareh saw Lance the next day. He did not review Lance's medical history, and at that time Lance was not experiencing any of the symptoms that he had displayed the previous evening. Instead of inserting a shunt, Dr. Kareh placed a ventricular drain in Lance's brain to monitor his intracranial pressure for twenty-four hours. At that time, Dr. Kareh concluded that Lance did not

[1] Reference to Lance having "obstructive hydrocephalus" means "compensated obstructive hydrocephalus."

3

have any sustained abnormal pressure that would immediately require a shunt. But Dr. Kareh indicated that Lance would most likely need a shunt in the future. Dr. Kareh ultimately did not conduct a third ventriculostomy or insert a shunt.

Lance had another symptomatic episode on February 15, 2010. Lance informed Dr. Gill of this episode, and he underwent another MRI on April 23, 2010 and an EEG on April 29, 2010. The MRI revealed that Lance's aqueductal stenosis had progressed and worsened since his last MRI. Dr. Gill learned of these results, but he did not inform Dr. Kareh of the MRI results or about Lance's latest symptoms reported at his follow-up visit with Dr. Gill.

Tragically, Lance died in his sleep on May 2, 2010. According to Windrum, Lance had recently complained of feeling tired, sluggish, and irritable, and he had reported having slurred speech the previous day. A medical examiner for Harris County, Dr. Morna Gonsoulin, performed Lance's autopsy. He found that Lance's brain had "no epidural, subdural, or subarachnoid hemorrhage," had "[s]ections through the cerebrum reveal[ing] markedly expanded lateral ventricles with rostral and caudal extensions to the frontal and occipital poles, respectively," and that "the periaqueductal gray matter [was] blurred with prominent stenosis of the aqueduct at the level of the cerebral pedicles . . . [with] [t]he diameter of the aqueduct rang[ing] from pinpoint to non-visible, obscured by ill-defined light tan gelatinous gray material." The autopsy report also revealed that "[s]ections from rostral pons through medulla show[ed] marked stenosis of aqueduct with gliosis of adjacent structures." Dr. Gonsoulin noted that Lance's heart was enlarged and its chambers were dilated and concluded that "[c]omplications of hydrocephalus due to aqueductal stenosis" caused Lance's death.

## B. Procedural Background

Windrum filed a negligence suit against Dr. Kareh, among others, in her individual capacity, as the representative of Lance's estate, and on behalf of her three minor children. Windrum retained Dr. Robert Parrish, a neurosurgeon, and Dr. Ljubisa Dragovic, a forensic neuropathologist, to testify as experts. Dr. Parrish testified to breach of the standard of care and causation, and Dr. Dragovic testified to causation. Dr. Warren Neely, a neurosurgeon, and Dr. Kent Heck, a neuropathologist, testified for the defense.

The jury found Dr. Gill and Dr. Kareh negligent. The jury assigned twenty percent fault to Dr. Gill and eighty percent fault to Dr. Kareh and awarded damages to Windrum. To Windrum in her individual capacity, the jury awarded $211,280 for past pecuniary loss, $1,177,176.96 for future pecuniary loss, $30,000 for past loss of companionship and society, $200,000 for past mental anguish, and $250,000 for future mental anguish. The jury awarded Windrum's minor child B.W. $39,615 for past pecuniary loss, $220,720.68 for future pecuniary loss, $30,000 for past loss of companionship and society, $50,000 for future loss of companionship and society, $200,000 for past mental anguish, and $500,000 for future mental anguish. The jury awarded minor child J.W. $39,615 for past pecuniary loss, $220,720.68 for future pecuniary loss, $30,000 for past loss of companionship and society, $50,000 for future loss of companionship and society, $100,000 for past mental anguish, and $275,000 for future mental anguish. And the jury awarded minor child H.W. $39,615 for past pecuniary loss, $220,720.68 for future pecuniary loss, $30,000 for past loss of companionship and society, $50,000 for future loss of companionship and society, $75,000 for past mental anguish, and $200,000 for future mental anguish. The court awarded a total of $1,875,887.62

5

to Windrum, apportioning it as follows: $1,123,301.89 for Windrum in her individual capacity, $277,840.33 for B.W., $241,869.10 for J.W., and $232,876.30 for H.W.[2] The trial court denied Dr. Kareh's motion for judgment notwithstanding the verdict and motion for a new trial.

Dr. Kareh appealed, arguing that Windrum failed to present legally and factually sufficient evidence that he breached the standard of care by failing to install a shunt in Lance's brain, and that Windrum failed to present legally and factually sufficient evidence that his actions or omissions caused Lance's death. 518 S.W.3d 496 (Tex. App.—Houston [1st Dist.] 2017, pet. granted). The court of appeals agreed with Dr. Kareh and reversed the trial court's judgment. *Id.* at 499. Windrum moved for a rehearing and en banc reconsideration. *Id.* The court of appeals denied en banc reconsideration but withdrew its April 19, 2016 opinion and issued a new opinion on March 16, 2017. *Id.* The court of appeals' disposition remained unchanged in the new opinion. *Id.* Four justices dissented from the denial of en banc consideration. *Id.* at 496–97, 515 (Brown, J., dissenting) (pointing out that expert opinion can be based on experience and that an expert opinion need not always be supported by medical literature); *see also id.* at 520 (Jennings, J., dissenting) (agreeing with the trial court, concluding there was ample evidence for the jury to conclude that Dr. Kareh was negligent because Dr. Parrish provided specific underlying factual bases for his opinion). Windrum petitioned for review in this Court, which we granted. 61 Tex. Sup. Ct. J. 1238 (June 1, 2018). Windrum presents three issues: (1) whether the court of appeals erred in holding that Windrum's expert testimony concerning breach of the standard of care was conclusory; (2) whether the court of appeals erred in holding that any breach by Dr. Kareh was too remote from Lance's

---

[2] The differing amounts per child is likely because of the children's differences in age and needs.

6

death to support proximate cause; and (3) whether the court of appeals applied the correct standard of review in reviewing the factual sufficiency of the evidence.[3]

## II. Conclusory Expert Testimony as to the Standard of Care and Breach

First, we consider whether the court of appeals erred in holding that Dr. Parrish's expert testimony concerning breach of the standard of care was conclusory. If Dr. Parrish's expert opinion as to breach of the standard of care was not conclusory, then it was the sole obligation of the jury to determine Dr. Parrish's credibility over other experts, and this Court will not disturb the jury's findings. *See, e.g.*, *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (recognizing the principle that the jury is the sole judge of witness credibility). To prevail in a wrongful-death suit alleging medical malpractice, a plaintiff must establish the elements of negligence. *See Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017). That is, the plaintiff "must establish the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Id.* (citing *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)).

To establish breach of a duty, the plaintiff must establish an applicable standard of care. *See generally Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404–05 (Tex. 2009); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879–80 (Tex. 2001). In a medical malpractice negligence case, the standard of care is what a doctor of ordinary prudence in that

---

[3] Windrum listed an additional unbriefed issue challenging the legal sufficiency of evidence of Dr. Kareh's negligence in her petition for review, but she abandoned that issue in subsequent briefing. Additionally, Windrum urges in a final issue that the Court remand for a new trial in the interest of justice if we uphold the court of appeals' judgment. In the petition for review prayer, however, Windrum asks that we either affirm the trial court's judgment or remand for a new trial.

particular field would or would not have done under the circumstances. *See James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982) (per curiam). "Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. Conclusory testimony cannot support a judgment in a medical malpractice case. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). As such, we must examine the record to determine whether Windrum provided non-conclusory expert testimony to support the jury's verdict that Dr. Kareh breached a duty owed to Lance. *See id.*

A conclusory statement asserts a conclusion with no basis or explanation. *See id.* at 818; *see also Bustamante*, 529 S.W.3d at 462 (explaining that "[a]n expert's testimony is conclusory if the witness simply states a conclusion without an explanation or factual substantiation"). Bare or baseless opinions cannot support a judgment, even if there was no objection over their admission into evidence. *See Pollock*, 284 S.W.3d at 816. An "expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999); *see also Jelinek v. Casas*, 328 S.W.3d 526, 563 (Tex. 2010) ("It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury.").

"[I]t is the basis of the [expert] witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law . . . ." *Pollock*, 284 S.W.3d at 816 (citations omitted); *see also Palacios*, 46 S.W.3d at 876 (noting that "Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases"). Mere evidence of the

injury coupled with an expert's opinion that the injury might have occurred from the doctor's negligence has no tendency to show that the doctor's negligence caused the injury. *See Jelinek*, 328 S.W.3d at 536 (quoting *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1965)). And the mere *ipse dixit* of the expert—that is, asking the jury to take the expert's word for it—will not suffice. *See Pollock*, 284 S.W.3d at 816; *see also Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 806 (Tex. 2006) (explaining that testimony is fundamentally unsupported when "the only basis for the link between the [expert's] observations and his conclusions was his own say-so" (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 912–13 (Tex. 2004) (Hecht, J., concurring))). An expert cannot provide the jury with unexplained conclusions or ask the jury to "take his word for it" because of his status as an expert. *See Arkoma Basin Expl. Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008).

In short, under the well-established case law of this Court, an expert's statement or opinion is conclusory when: (1) he asks the jury to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion. *See Jelinek*, 328 S.W.3d at 536; *Pollock*, 284 S.W.3d at 816; *Mendez*, 204 S.W.3d at 801; *see also Hart*, 399 S.W.2d at 797 (holding that the expert testimony presented a question of fact upon which reasonable minds could differ and that "[i]t is not for this Court to decide whether . . . [the doctor's] . . . failure to perform surgery . . . was in fact negligence proximately causing [the] injuries. Rather it is for this Court to decide whether or not the evidence in the record presents facts which must be passed upon by the jury").

9

Experience alone may provide a sufficient basis for an expert opinion. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). But experience may not be sufficient in every case. *See id.* (explaining that "[a] more experienced expert may offer unreliable opinions, and a lesser experienced expert's opinions may have solid footing"). Further, medical literature is not necessary to support an expert's opinion, although it tends to strengthen the bases for the opinion and therefore is preferred. *See id.*

The court of appeals concluded that Windrum presented no evidence of the standard of care or that Dr. Kareh breached the standard of care because Dr. Parrish's expert testimony was conclusory. 518 S.W.3d at 513 (holding that the evidence was legally and factually insufficient to support the jury's verdict). Windrum challenges that no-evidence holding, arguing that Dr. Parrish's testimony was not conclusory. We review this no-evidence holding to determine whether, on the face of the record, the expert testimony lacked probative value. *See Pollock*, 284 S.W.3d at 817. In determining whether the expert testimony is speculative or conclusory, we are restricted to reviewing the face of the record. *See id.*

When the evidence presented to the jury is conclusory, it is considered no evidence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."). A conclusory expert opinion is different from an unreliable or inadmissible expert opinion. *See Pollock*, 284 S.W.3d at 816–17. A party may make a no-evidence challenge, as Dr. Kareh did in the court of appeals, asserting that the evidence is conclusory, "even in the absence of any objection

10

to its admissibility." *Id.* at 817. Conclusory testimony cannot support a judgment even when no objections to the testimony were made at trial. *See id.* at 816. No objection to the admissibility of conclusory testimony is necessary "if the complaint 'is restricted to the face of the record'" and asserts that an expert opinion "was speculative or conclusory on its face[] or assume[s] facts contrary to those on the face of the record." *Arkoma Basin Exploration Co., Inc.*, 249 S.W.3d at 388 (citations omitted).

The integrity of the jury's verdict depends on the appellate court ensuring that the jury has relied upon solid, non-conclusory evidence that is not the mere *ipse dixit* of the expert. *See Pollock*, 284 S.W.3d at 816. The line determining whether an expert opinion is conclusory is difficult to draw, and "[c]lose calls must go to the trial court." *See Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006) (per curiam). But when the evidence falls within the zone of reasonable disagreement, the court may not substitute its judgment for that of the fact finder. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *see also Jackson*, 116 S.W.3d at 761 (stating that "a court must not merely substitute its judgment for that of the jury," and "the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony"). If "the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge." *Jelinek*, 328 S.W.3d at 538.

Dr. Parrish testified that in developing his opinion he reviewed: (1) Lance's medical records, including his autopsy; (2) chapters in textbooks; (3) a "number of literature searches," some of which were conducted by other physicians involved in this case; and (4) the deposition testimony of other doctors involved in this case, including Dr. Kareh, Dr. Gill, Dr. Heck, and Dr. Dragovic.

11

Dr. Parrish ultimately concluded that the "MRI plus classic symptoms" exhibited by Lance "equals a shunt." Therefore, in Dr. Parrish's expert opinion, Dr. Kareh breached the standard of care when he failed to insert a shunt. He based this conclusion on his own experience treating patients with hydrocephalus and intracranial pressure, the experience of other doctors in the field, Lance's own medical records and test results, Lance's autopsy report, and the testimony of Dr. Dragovic, the forensic pathologist. Dr. Parrish explained how and why all of these bases led him to conclude that Lance required a shunt. However, Dr. Parrish cited medical literature in support of only some of his opinions.[4] He failed to cite any literature in support of his ultimate conclusion that the standard of care for Lance's condition required insertion of a shunt. However, in addition to providing his resume and describing his experience, Dr. Parrish provided enough reasons for his opinion. While Dr. Parrish undoubtedly could have provided more solid support for his conclusion, he provided a basis for his opinion which was more than mere *ipse dixit*.

The record contains standard-of-care testimony from Dr. Parrish and competing standard-of-care testimony from the defense experts. After laying out his extensive qualifications as a neurosurgeon, Dr. Parrish explained that he instructs around twelve neurosurgery medical students and that the treatment and recognition of hydrocephalus are part of his hospital's teaching program. Dr. Parrish testified that he reviewed the credentials of Dr. Neely, the defense's expert neurosurgeon, that he reviewed Lance's medical records in connection with this case, and that he

---

[4] For example, he cited a paper that contained a list of symptoms of increased intracranial pressure to support his assertion that the symptom of papilledema is not necessary to have intracranial pressure; he cited a paper about dog brain experiments with large, stiff ventricles pushing on the brain stem; and he cited literature in support of his assertion that herniation is not always required for there to have been increased intracranial pressure and hydrocephalus.

12

reviewed "some chapters in textbooks . . . and . . . a number of literature searches that were performed, some by [himself] and some by the other doctors involved in the case." He also testified that he reviewed the deposition testimony of Dr. Kareh, Dr. Gill, Dr. Heck, and Dr. Dragovic in preparation for his testimony. Dr. Parrish concluded that Dr. Kareh should have inserted a shunt in Lance's brain when he was in the hospital and that Lance died from obstructive hydrocephalus because Dr. Kareh failed to insert a shunt. In explaining the bases for his conclusion, Dr. Parrish provided an animated demonstrative of the brain to the jury and explained the anatomy of the brain, focusing on the lateral ventricles and aqueduct. Dr. Parrish explained that the cerebral spinal fluid is made in the ventricles, demonstrating where the continuous flow of the fluid transfers through the aqueduct and ventricles, circulates around the brain and spinal cord, and eventually flows into the vena system and back to the heart. He also explained to the jury the nuclei of the brainstem, through which the cerebral spinal fluid passes through the aqueduct, and which has an important role in regulating the autonomic functions of our body, such as respiration and regulation of the heartbeat. And if there is even the slightest irregularity things can go very wrong—which is what Dr. Parrish claims happened to Lance. According to Dr. Parrish's testimony, Lance died because his aqueduct became obstructed. Dr. Parrish explained to the jury that because there was pressure in the ventricles, due to the inability of the spinal fluid to travel through the aqueduct, it put pressure on the region of the brainstem which controls all the vital autonomic functions, such as heartbeat regulation and respiration, which stopped when the pressure built too high.

13

Dr. Parrish refuted the defense's representation that there was no evidence of pressure in Lance's case[5] by explaining that although there was no evidence of papilledema, which is pressure on the optic nerve,[6] there was clinical evidence of increased intracranial pressure because Lance had the classic symptoms of staggering, slurred speech, and periodic altered mental status, which occurred at least four times in the year before he died. Further, he explained that the presence or absence of papilledema could indicate that Lance had scar tissue preventing the pressure from reaching the back of the eyes; thus, its absence was not significant. Dr. Parrish indicated this was widely known in the medical field and did not produce any literature to verify that position. He did, however, include a paper in his production of literature to the defense, which he told the jury about, showing that papilledema is not always a symptom of increased intracranial pressure in hydrocephalus. Dr. Parrish further testified that "the contour of the ventricles and even the contour of the aqueduct is proof that there [was] at some time increased intracranial pressure, [and] increased intraventricular pressure." He also explained the MRI images of Lance's brain, showing the progression of the pressure and pointing out his enlarged third ventricle and his narrow aqueduct—all indications that Lance's condition was getting worse. Dr. Parrish believed that Lance's encephalitis at the age of six caused scarring in his aqueduct, which caused narrowing of the aqueduct, increased intracranial pressure, and hydrocephalus as an adult. Dr. Neely agreed that Lance's encephalitis as a young child likely caused the aqueductal stenosis. The defense believed

---

[5] Dr. Neely, the defense's expert neurosurgeon, testified that he believed that Lance's MRI and CAT scans did not show any evidence of increased pressure and that his autopsy failed to indicate that Lance had any intracranial pressure elevations at the time of his death.

[6] *See Papillitis*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (defining it as "inflammation of the optic disk").

14

that there should be some evidence of injury to Lance's brain, such as herniation,[7] for Lance to have died from hydrocephalus. But Dr. Parrish testified that some injury to the brain, such as herniation, is not necessary for hydrocephalus.

When asked if he needed to review literature to understand how Lance's death occurred, Dr. Parrish responded that he did not need to seek out literature because he had experienced patients with the same condition. For example, as evidence that a patient may not always experience herniation with hydrocephalus, Dr. Parrish provided an extensive example, including drawings and explanations, of a patient who had increased pressure but did not experience herniation due to how quickly the pressure built in his brain. He treated that patient with a ventriculostomy to reduce the pressure. He also provided an example about patients who experience colloid cysts,[8] which cause intracranial pressure without herniation. Dr. Parrish went through three articles, one-by-one, and explained to the jury that they are peer-reviewed and considered reliable and credible by neurosurgeons and explained how they supported his position on herniation.

Dr. Parrish also presented Lance's medical records to the jury and explained why and how he used them to form the basis for his conclusions. Specifically, Dr. Parrish read to the jury the findings from Lance's initial MRI conducted on February 3, 2010, which concluded that "[t]he lateral ventricles and third ventricles are markedly dilated out of proportion with [the] fourth

---

[7] *See Herniate*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (showing the act or process of "protrud[ing] through an abnormal body opening").

[8] A colloid cyst is a gelatinous or mucinous type of abnormal structure, such as a tumor. *See Colloid*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002); *Cyst*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).

15

ventricle and sulci." Dr. Parrish explained that this means the emergency room doctors found aqueductal stenosis and that Lance suffered from obstructive hydrocephalus.

Further, Dr. Parrish refuted causes other than hydrocephalus that the defense experts suggested caused Lance's death. For example, Dr. Parrish presented a demonstrative to the jury showing what it would look like if a patient died of ex vacuo hydrocephalus, a brain-eating virus that the defense suggested Lance may have had. The difference between the demonstrative and Lance's brain images, as well as his behavioral symptoms, tended to disprove the defense's theory. He also testified that he did not think Lance suffered from a heart condition or that any of Lance's medications were relevant to the cause of his death. As explained above, he also ruled out the absence of certain indicators of increased intracranial pressure, such as herniation and papilledema, as an indication that he died of something other than hydrocephalus. And he said that even if Lance had suffered from seizures, hydrocephalus could still be the cause of his death. Further, Dr. Parrish testified that in February 2010 Lance showed the classic symptoms of increased intracranial pressure—off balance, slurred speech, confusion, and a headache. Although Dr. Neely testified that these symptoms did not necessarily indicate Lance had increased intracranial pressure, Dr. Parrish ultimately concluded, based on the MRI evidence and Lance's classic symptoms of increased intracranial pressure, that the standard of care for a neurosurgeon (here, Dr. Kareh) required insertion of a shunt into Lance's brain.

We note the similarity of this case to *Baty v. Futrell*, 543 S.W.3d 689 (Tex. 2018), in which we recently analyzed whether a medical expert's opinion as to standard of care was conclusory. In *Baty*, this Court addressed whether a patient, whose optic nerve was damaged during the

16

administration of anesthesia prior to cataract surgery, submitted an adequate expert report that sufficiently articulated the causal relationship between the nurse anesthetist's failure to meet the standard of care and the patient's injury under the Texas Medical Liability Act. *See id.* at 690. Although we concluded that the report's statement that anesthesia should be administered "in the proper manner" to avoid eye injury, by itself, was an impermissible conclusory statement, after reviewing the report in its entirety, we determined that the report was sufficiently specific and non-conclusory. *Id.* at 695–97. The expert did not simply state in his report that he knew the standard of care and concluded it was not met, nor did he "improperly equate negligence with a bad or unsuccessful result." *Id.* at 696 (citing *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 196 (Tex. 2012) (Lehrmann, J., dissenting)). Rather, the expert provided that inserting the anesthesia needle into the optic nerve is specific conduct falling below the standard of care and causing a bad result. *See id.*

Similarly, Windrum provided an expert who testified that Lance would not have died had Dr. Kareh inserted a shunt into his brain weeks earlier—a specific action that all neurosurgeons would know to do, according to Dr. Parrish. Dr. Parrish did not simply state the standard of care and that it was not met; he provided specific reasons why he concluded that Lance suffered from increased intracranial pressure and hydrocephalus, how he likely developed his condition, that his condition was progressing, and Dr. Parrish explained that a neurosurgeon was necessary and what the neurosurgeon should have done to prolong Lance's life.[9]

---

[9] The jury also heard competing testimony from Dr. Neely. He told the jury that he would have monitored the intracranial pressure further rather than inserting a shunt in Lance's brain.

17

When explaining what he believed caused Lance's death, Dr. Parrish explained: "His aqueduct obstructed. There[] [was] pressure in the ventricles. It put pressure on the red nuclei and the periaqueductal region right around where all [the] important [brain stem] stuff is. And those fibers made him stop breathing and his heart stop beating." Although the defense experts asserted that there was no evidence of pressure, Dr. Parrish provided a specific response. Dr. Parrish responded that although "there was no evidence of pressure that he had papilledema," which occurs when increased pressure in the brain causes the optic nerve to swell, there was "clinical evidence of pressure." Dr. Parrish further explained that the "classic symptoms of increased intracranial pressure with staggering, slurred speech, and [periodic] altered mental status" indicated there was pressure, but the pressure would not appear every time Lance was under observation.

Dr. Parrish opined that Lance's symptoms were progressive because the aqueductal stenosis, which caused the hydrocephalus, developed over time since he suffered from encephalitis as a young child, and his brain had continued to compensate through the years until it finally became too much for his brain to handle. Dr. Neely said he did not believe Lance's symptoms were progressive. When asked to explain why he believed Lance's symptoms were progressive, however, Dr. Parrish testified:

> He had the four prior episodes, had two that were not quite as bad. They blew them off. Then had the one December [twenty fourth]. That was really pretty bad . . . . and he had . . . headaches. . . . And that progression, . . . [t]hat's intermittent [non-communicating] obstructive hydrocephalus. He's at the end of his compensation. It took him [forty] years to get there, but he need[ed] a shunt.

18

He also explained how scarring, like the one that likely caused the stenosis in Lance's brain from his childhood encephalitis, could have changed over time, causing progressive symptoms, but admitted he had no absolute evidence that this occurred with Lance.

Dr. Parrish even referred to a previous CAT scan of Lance's brain, taken while Lance was training as an X-ray technician in 2001. It showed that Lance's ventricles were larger than normal—a sign of increased intracranial pressure. On cross examination, the defense pointed out that Dr. Parrish did not know whether the size of Lance's ventricles had changed since then or whether there had even been any changes to the ventricles in the prior ten years. Dr. Parrish admitted that it "would be pure speculation . . . to tell . . . how much of his aqueduct" had been blocked and when exactly the blockage occurred. But Dr. Parrish refused to say that it was pure speculation that Lance had progressive changes in his aqueduct from the time he had encephalitis to the time his hydrocephalus was discovered. Although he had no evidence that there were changes from when Lance was around six to around thirty-years old, he pointed to evidence of changes between ages forty-five and forty-six "because [Lance] became symptomatic during that time," and progression can be assumed over those forty years he was asymptomatic. Dr. Dragovic also referenced this prior CAT scan, explaining that Lance's enlarged ventricles would not have given him much trouble at that time because he was much younger.

Thus, Dr. Parrish's testimony was based on actual data, including the autopsy report, Lance's brain scans, the reports of other doctors who treated Lance, and on his own experience with those symptoms; and the jury could reasonably rely on the conclusions and decide which experts to give greater weight. *See, e.g.*, *Earle*, 998 S.W.2d at 890 (indicating that an expert must link his

19

conclusions to the facts by explaining the bases for his statements); *see also Jackson*, 116 S.W.3d at 761 (explaining that the jury is the sole judge of a witness's credibility).

The jury also heard why a neurosurgeon is necessary when dealing with a diagnosis of obstructive hydrocephalus. After Lance's other attending physicians concluded that Lance had obstructive hydrocephalus and that he "may ultimately need a shunt," they referred him to Dr. Kareh because a neurosurgeon would be the "ultimate decision-maker on whether . . . surgery is appropriate." And Dr. Parrish explained that a reasonably prudent neurosurgeon presented with Lance's case would have concluded that Lance's MRI, in addition to his classic hydrocephalus symptoms, indicated that inserting a shunt was necessary.

Further, Dr. Parrish did not "improperly equate negligence with a bad or unsuccessful result" by opining that Dr. Kareh must have been negligent because he was Lance's neurosurgeon at the time of his death. *See Baty*, 543 S.W.3d at 699 (citing *Williams*, 371 S.W.3d at 196) (Lehrmann, J., dissenting)). In fact, Dr. Parrish agreed that "excellent neurosurgeons . . . can differ in opinion[,] . . . and it doesn't mean that someone's negligent." Based on his experience with obstructive hydrocephalus as a neurosurgeon, Dr. Parrish explained the generic symptoms of the condition and told the jury that these generic symptoms—off balance, slurred speech, confusion, and headaches—in combination with Lance's MRI showing severe aqueductal stenosis pointed only to obstructive hydrocephalus and needed to be the "light bulb that . . . go[es] off and say[s] this requires a shunt." Dr. Dragovic's affidavit stating that he saw a hemorrhage[10] in the aqueduct region of

_____

[10] *See Hemorrhage*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("bleed[ing]").

20

Lance's brain independently supported Dr. Parrish's opinion that there was pressure on top of the brain stem, ultimately causing Lance's death.

Dr. Parrish also explained his belief that Dr. Kareh misdiagnosed Lance and that Dr. Kareh's treatment of Lance was only providing temporary relief. Relying on Dr. Kareh's report, which indicated that "no hydrocephalus [was] identified," Dr. Parrish opined that Dr. Kareh "clearly" misdiagnosed Lance after monitoring him for only a short period of time. Dr. Parrish explained that, according to Dr. Kareh's operative report for monitoring Lance's pressure, it appeared Dr. Kareh believed he temporarily treated Lance without having to insert a shunt. However, Dr. Parrish explained that this treatment would last only until Lance had another episode of built-up intracranial pressure. Dr. Kareh did not specify the measurement of Lance's pressure or how much spinal fluid was drained out, "and it may take a whole day to build up enough spinal fluid to have . . . increased pressure"; as such, Dr. Parrish believed that Dr. Kareh only treated Lance's condition for twenty-four hours and mistakenly concluded Lance did not need a shunt at that time. Dr. Parrish also told the jury that the "gold standard" for diagnosing hydrocephalus would either be to monitor the patient for a long period of time or use an MRI to see whether there is aqueductal stenosis. Moreover, Dr. Kareh, at the time of trial, admitted that he believed Lance had obstructive hydrocephalus.

In *Bustamante v. Ponte*, we considered whether the testimony of two experts, who opined that the doctor-defendants negligently caused the child's vision loss, was conclusory. *See* 529 S.W.3d at 462. We pointed out that although the experts' testimony "could have been better," "they did not simply state a conclusion without any explanation or ask the jurors to take their word for it." *Id.* at 465; *see also, e.g.*, *Arkoma Basin Expl. Co., Inc.*, 249 S.W.3d at 389 (explaining that although

21

the expert's testimony "could have been a lot clearer" and "references to 'up here' and 'right there' on slides and posters used at trial" made it hard to tell what the expert was talking about, "we [could not] say on [that] record that his opinions were unreliable or speculative. Nor were they conclusory as a matter of law. [The expert] did not simply state a conclusion without any explanation, or ask jurors to 'take [his] word for it'" (citations omitted)). The experts provided evidence of the applicable standard of care, how the doctors breached the standard of care, and that the outcome more likely than not would have been different without the negligent acts. *Bustamante*, 529 S.W.3d at 465. The experts supported their opinions with their clinical experience, studies in which they personally participated, their review of the child's medical records, and in-person examinations of the child—therefore, the experts tied their conclusions to the facts such that their opinions were not conclusory. *See id.*

Dr. Parrish's testimony, similarly, was based on Lance's medical records in this case—including other doctors' reports about Lance's symptoms, the tests run to diagnose aqueductal stenosis and obstructive hydrocephalus, Lance's own symptoms, and the autopsy report—as well as his own extensive experience as a neurosurgeon, and refuted the defense's theories of other causes. When asked whether he needed to review any literature to understand how Lance's death occurred, Dr. Parrish explained that it was not necessary because he had experienced patients who have almost died from brain stem compression from acute hydrocephalus and he had seen stiff ventricles many times in patients in which he inserted shunts.

Dr. Parrish also explained to the jury that there would have been risks involved with surgery to insert a shunt. Dr. Neely testified about the risks and complications associated with shunts. And

22

Dr. Parrish agreed that "one of the complications of placing a shunt is death" and that there are real, but rare, risks associated with shunts. However, Dr. Parrish asserted that inserting a shunt would have given Lance the greatest chance to live.

Dr. Parrish agreed that there was no evidence of a sudden increase in intracranial pressure in Lance's autopsy. But he also stated that the experts who believed there was no evidence of intracranial pressure were discounting "the clinical presentation of the patient where the patient had these multiple episodes of symptoms of increased intracranial pressure [a]nd over the years that repeated increased incidence of intracranial pressure has dilated the ventricles." Dr. Parrish also agreed that there was no apparent swelling of the brain, except that he observed it "was a little heavy." And he agreed there was no indication of herniation or bleeding in the autopsy. Dr. Parrish, however, told the jury that the absence of herniation does not mean that there was no pressure because intracranial pressure caused compression on the top of the brain stem.[11]

Ultimately, Dr. Parrish concluded that a reasonable, prudent neurosurgeon under the same or similar circumstances would have: (1) "made the right diagnosis" of symptomatic obstructive hydrocephalus; (2) "recommended a shunt or some definitive procedure to treat the hydrocephalus"; and (3) "properly informed the patient and the patient's family what would happen if he got a shunt, . . . [and] even more importantly, . . . the benefit of getting the shunt and the risk of not getting a shunt." The jury heard competing testimony concerning the breach of the standard of care. It was within the province of the jury to determine which evidence it believed more credible. *See Jelinek*,

_____

[11] Dr. Parrish pointed to many articles supporting his assertion that there need not be evidence of herniation to have increased intracranial pressure, but the defense asserted that these articles failed to support his opinion. Dr. Neely told the jury he did not believe anyone could die from obstructive hydrocephalus without seeing evidence of herniation.

328 S.W.3d at 538 (explaining that "[c]ourts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another"). Although the bases for Dr. Parrish's testimony could have been better, we hold that Dr. Parrish's testimony as to the standard of care and Dr. Kareh's breach of that standard of care "did not simply state a conclusion without any explanation or ask the jurors to take [his] word for it" and therefore was not conclusory.[12] *See Bustamante*, 529 S.W.3d at 465. It is not the province of this Court to substitute its judgment for the jury's as to the standard of care or breach.

### III. Proximate Cause

We next consider whether the court of appeals erred in holding that Dr. Kareh's negligence was "too remote" to support proximate causation.[13] The court of appeals held that "even if Dr. Kareh's actions did fall below the standard of care, Windrum failed to establish that Dr. Kareh's actions proximately caused Lance's death" because the failure to insert a shunt "was not an immediate cause of [Lances's] death." 518 S.W.3d at 513–14. We hold that once the jury found that Dr. Kareh breached the standard of care by failing to insert a shunt in Lance's brain weeks before his death, it was also entitled to find that the breach constituted proximate cause because

---

[12] Our holding today should not be construed to mean that doctors should suggest surgical intervention over other appropriate treatments. Nor should this opinion be construed to undermine doctors who reasonably believe it is in the best interests of their patients to hold off on surgical intervention—the standard of care in such instances would likely not be surgery. A reasonable jury, however, could find, as it did here, that the standard of care required surgical intervention. *See Jelinek*, 328 S.W.3d at 538 (pointing out that the jury holds the role of the fact finder and that a court should defer to the jury's finding when it is supported by credible evidence). Although shunt surgery is risky, as any brain surgery is, and a reasonable doctor would be cautious before recommending it, the record evidence would allow the jury to decide that the standard of care in this case required a shunt. It will not always be unreasonable, or a breach of the standard of care, for a doctor to monitor the condition before recommending a risky procedure.

[13] We note that although Windrum's second issue could arguably incorporate a legal sufficiency challenge as to causation evidence, Windrum dropped her unbriefed legal sufficiency issue when she filed her brief on the merits. Therefore, we do not address legal sufficiency of the causation evidence.

24

failure to properly diagnose and treat can be a substantial factor in causing injury in a medical malpractice case.

## A. Proximate Cause Standard

Proximate cause consists of (1) cause in fact, and (2) foreseeability. *Bustamante*, 529 S.W.3d at 456 (citation omitted). Cause in fact "is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* (citation omitted). This Court has long held "that a defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *See, e.g.*, *id.* at 457; *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex. 1992). An injury may also have more than one proximate cause. *See, e.g.*, *Bustamante*, 529 S.W.3d at 457; *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010); *see also Mason*, 143 S.W.3d at 798–99 (explaining that the two elements of proximate cause, substantial factor and foreseeability, "cannot be satisfied by mere conjecture, guess, or speculation"). Further, the defendant's negligence "may be too attenuated from the resulting injuries to be a substantial factor in bringing about the harm" where the negligence was not the active cause of the injury, "but merely created the condition by which the . . . act of negligence could occur." *See Mason*, 143 S.W.3d at 799.

Though we have cautioned that some negligent conduct may be "too attenuated" to constitute proximate cause, our case law makes clear that the proof required is that the negligence be a substantial factor, not that it be the "immediate cause." *See, e.g.*, *Bustamante*, 529 S.W.3d at 456 (providing that the standard to prove causation is whether the negligent act or omission was a substantial factor in bringing about the harm); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508,

25

511 (Tex. 1995) (explaining that recovery is barred when the defendant's negligence "deprived the patient of only a fifty percent or less chance of survival" because the patient has to show "evidence of a 'reasonable medical probability'" that the negligence was a substantial factor in bringing about the harm); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 398, 407 (Tex. 1993) (holding no liability for negligent treatment that decreases a patient's chance of survival where the patient would not survive anyway, but explaining that the ultimate determination of whether there is proximate cause is whether the negligent action is a substantial factor). Never have we adopted an "immediate cause" standard as the court of appeals did here. *See* 518 S.W.3d at 514.

Additionally, where there is evidence of other plausible causes of the injury that could be negated, the plaintiff must provide evidence that excludes those plausible causes with reasonable certainty. *See Bustamante*, 529 S.W.3d at 456 (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997)). The plaintiff's "expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts." *Jelinek*, 328 S.W.3d at 536. As such, if the "facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion." *Id.* A plaintiff, however, "need not speculate about other possible unknown causes and then disprove them." *Bustamante*, 529 S.W.3d at 457 (quoting *Ponte v. Bustamante*, 490 S.W.3d 70, 95 (Tex. App.—Dallas 2015, *reversed*, 529 S.W.4d 447 (Tex. 2017) (Schenck, J., dissenting))).

26

In a negligence case, plaintiffs must "adduce evidence of a 'reasonable medical probability' or 'reasonable probability'" that the defendants' negligence caused their injury—that is, it must be "'more likely than not' that the ultimate harm or condition resulted from such negligence." *Id.* at 456 (citation omitted); *see also Jelinek*, 328 S.W.3d at 536 ("When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that 'in medical probability' the injury was caused by the defendant's negligence."). The ultimate question, then, "is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Bustamante*, 529 S.W.3d at 456 (quoting *Park Place Hosp.*, 909 S.W.2d at 511). We review the record regarding Windrum's evidence on causation to determine whether the court of appeals correctly held that, as a matter of law, Dr. Kareh's actions or omissions could not be a substantial factor in causing Lance's death—that is, whether a doctor's failure to diagnose and properly treat a patient can be a proximate cause of that patient's death when the immediate cause of death is the patient's underlying condition.

### B. Windrum's Causation Evidence

Dr. Dragovic testified about the forensic pathology concerning Lance's death. He provided the jury with an extensive list of his qualifications and experience in forensic pathology. Dr. Dragovic testified that there was no doubt in his mind about the cause of Lance's death: obstructive hydrocephalus caused by acute obstruction of the aqueduct. Dr. Dragovic based his opinion on his own experience performing thousands of autopsies, on Lance's medical records and investigative material from Harris County, on the reviews and opinions of other doctors, and on

27

literature reviewed in connection with the case. Dr. Dragovic analyzed examples of brain slides with an unobstructed aqueduct and compared them to the slides from Lance's autopsy. He also explained to the jury that the blood cells found in Lance's slides are physical proof that an episode of increased pressure occurred due to a blockage of Lance's aqueduct.

On cross examination, Dr. Parrish admitted that Lance's symptoms could have been caused by something other than increased intracranial pressure. Dr. Parrish also agreed that Lance's symptoms of slurred speech and staggered walking when he was admitted to the hospital in February 2010 could have been caused by Benzodiazepines, for which Lance tested positive, or could have indicated that Lance had a seizure. Dr. Parrish did not specifically rule out these other causes. However, Dr. Parrish said that he had not seen any evidence that Lance's symptoms were caused by anything other than obstructive hydrocephalus and that there was no doubt in his mind as to what caused Lance's death, and he told the jury that he believed Lance's use of Benzodiazepines was irrelevant to the case.[14]

Dr. Dragovic also testified that it is well known that herniation is not needed to die of obstructive hydrocephalus. Using slides of Lance's brain tissue, he showed the jury blood cells around the aqueduct—proof that Lance suffered from increased pressure due to a blockage of the aqueduct. Dr. Parrish based his opinion, in part, on this physical proof. Dr. Dragovic also excluded a heart condition as a possible cause of Lance's death because his EKG was normal.

---

[14] Further, Dr. Parrish and Dr. Heck opined that even if seizures caused Lance's symptoms, the most likely cause of death was still obstructive hydrocephalus.

28

Dr. Dragovic testified that after reviewing Lance's autopsy and microscopic slides from his brain, "there [was] no doubt in [his] mind that . . . he died of an acute obstruction of the aqueduct complicating obstructive hydrocephalus [which he] suffered [from] for a long period of time." Additionally, Dr. Gill testified that it was always clear to him that Lance suffered from obstructive hydrocephalus and that the applicable standard of care would be to either insert a shunt or conduct a ventriculostomy.

Dr. Kareh also said himself that Lance had hydrocephalus. He testified that he told Lance that if he had increased intracranial pressure, he might have to have a shunt. Dr. Kareh told the jury that he explained the risks of inserting a shunt to Lance, and Lance ultimately consented to monitoring his pressure through a ventricular drain, during which Dr. Kareh was prepared to insert a shunt if needed. According to Dr. Kareh, if he prematurely inserted a shunt in Lance's brain, it could drain an excessive amount of fluid, shrinking the brain and causing a subdural hematoma.[15] Dr. Kareh removed the drain—without accessing the computer records that monitored the pressure—after he observed normal intracranial pressure in Lance's brain. Dr. Kareh also admitted on cross examination that he failed to read the treatment notes in Lance's file. This indicates that Dr. Kareh first missed the cause of Lance's elevated pressure.

In *Providence Health Center v. Dowell*, 262 S.W.3d 324 (Tex. 2008), which involved a wrongful death action for negligence in failing to prevent the patient from committing suicide by properly assessing him while he was in the emergency room, we held that the patient's discharge

---

[15] "Subdural hematoma" means "swelling containing blood" "under the dura mater." *See Subdural*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002); *Hematoma*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).

from the emergency room for treatment from a suicide attempt without an assessment for further suicide risk was too attenuated to be the proximate cause of the patient's suicide thirty-three hours later. *See id.* at 329–30. This was because there was no evidence that conducting a proper assessment in the emergency room would have prevented the suicide. *See id.* (explaining that there needs to be a "sufficient causal nexus between the [defendant's] duties and breaches . . . and the injuries suffered by [the plaintiff]") (quoting *Mason*, 143 S.W.3d at 803)); *see also Givens v. M&S Imaging Partners, L.P.*, 200 S.W.3d 735, 741–42 (Tex. App.—Texarkana 2006, no pet.) (holding that the chain of causation was too attenuated for the alleged negligence to be a proximate cause where a mother brought suit on behalf of her brain-damaged child alleging that negligence in improperly taking an ultrasound image led to the child's brain damage). In contrast, Windrum provided a "sufficient causal nexus" between the duty owed to Lance, Dr. Kareh's breach of that duty, and how this could be the proximate cause of Lance's death—that Lance's condition left untreated without the insertion of a shunt caused his death.

Windrum asserts that requiring a doctor's negligence to be the immediate cause of a patient's injury, as the court of appeals seemed to do, applies an inappropriate proximate cause standard and will bar liability in most failure-to-treat cases. Because the cause-in-fact element of proximate cause is measured by whether the defendant's conduct is too attenuated from the plaintiff's injury to be a substantial factor in bringing about the injury, we conclude that the "substantial factor" test is appropriate here. *See Mason*, 143 S.W.3d at 799–800. As such, Windrum was not required to show that Dr. Kareh's negligence was an immediate cause of Lance's death, just that it was a substantial factor. *See Bustamante*, 529 S.W.3d at 456 (specifying that the question is whether the negligent act

30

or omission was a substantial factor in bringing about the harm).  We conclude that, on this record, the court of appeals erred in holding that Dr. Kareh's negligence could not have been a substantial factor in causing Lance's death.

Dr. Parrish tied his conclusions to the facts and explained, to a reasonable degree, how and why Dr. Kareh's breach of the standard of care caused the injury. *See Jelinek*, 328 S.W.3d at 539–40. Windrum thus created a credibility issue for the jury to determine which expert's testimony to give greater weight. *See id.* at 538.  The jury could have interpreted Dr. Kareh's testimony as supporting Dr. Parrish's opinion as to causation.  The jury had ample evidence from Dr. Dragovic alone from which to conclude that Lance died of obstructive hydrocephalus and not from some other cause. Further, the chain of causation between Dr. Kareh's actions and Lance's death is not too attenuated to support proximate cause because failure to insert a shunt was a direct link in the causal chain of Lance's death—according to Dr. Parrish, had Dr. Kareh inserted the shunt, Lance would not have died of obstructive hydrocephalus.  *See, e.g.*, *Mason*, 143 S.W.3d at 799–800 (holding that if the conduct of the defendant is too attenuated from the resulting injuries, it is not a substantial factor in bringing about the harm).  The jury had ample evidence to determine that Dr. Kareh's acts or omissions were the proximate cause of Lance's death.  We hold that a breach of the standard of care was not too remote for a reasonable jury to find it to be the proximate cause of Lance's death.

### IV. Standard of Review for Factual Sufficiency of the Evidence

Windrum argues that the court of appeals' decision is erroneous because it failed to apply the correct standard of review for factual sufficiency of the evidence.  Ordinarily, a court of appeals will not address the factual sufficiency of the evidence if it determines the evidence is legally insufficient.

*See generally Wilson*, 168 S.W.3d at 810 (distinguishing between the legal and factual sufficiency standards, explaining that legal sufficiency review generally disregards contrary evidence and factual sufficiency review weighs all evidence); *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401–02 (Tex. 1981) (per curiam) (providing that when both factual and legal sufficiency challenges are raised in a court of appeals, the court should first resolve the legal sufficiency challenge, and the factual sufficiency challenge often may not be addressed until after this Court has decided legal sufficiency and remanded to the court of appeals to decide factual sufficiency); *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951) (per curiam) (explaining that appellate courts must weigh all the evidence in conducting factual sufficiency review, regardless of whether there is some evidence of probative force to find legal sufficiency, suggesting that courts need not reach factual sufficiency when they find legally insufficient evidence). Here, however, the court of appeals expressly set out the standard for factual sufficiency and asserted a conclusion that the evidence was factually insufficient, despite holding that the evidence was legally insufficient.

"Although this Court does not have jurisdiction to conduct a factual sufficiency review, we do have jurisdiction to determine whether a court of appeals has applied the correct standard in conducting a factual sufficiency review." *Jackson*, 116 S.W.3d at 761. When conducting a factual sufficiency review, the court of appeals should not substitute its judgment for that of the jury and should "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust[,]" shock the conscience, "or clearly demonstrates bias." *Id.* (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

32

In this case, the court of appeals recited the proper standard for factual sufficiency review, but it did not explain how it reached the conclusion that Windrum failed to present factually sufficient evidence, explaining and analyzing only the legal sufficiency of the evidence. *See* 518 S.W.3d at 508–13. Although the court of appeals detailed the evidence in the record, nowhere did its opinion explain how that evidence is "so against the great weight and preponderance as to be manifestly unjust," shock the conscience, or clearly demonstrate bias such that it should substitute its judgment for that of the jury's. *See Jackson*, 116 S.W.3d at 761 (quoting *Pool*, 715 S.W.2d at 635)). And nowhere did it state "in what regard the contrary evidence greatly outweighed the evidence in support of the verdict." *See id.* at 775–76 (detailing an example in which the court of appeals failed to describe the evidence that supported the jury's failure to award any damages for physical impairment and in what regard the contrary evidence outweighed the evidence supporting the verdict). While we recognize that the court of appeals may have intended to convey simply that Dr. Parrish's testimony was legally insufficient *and therefore the evidence was also factually insufficient to support the trial court's judgment*, it is not our province to guess at the court of appeals' thought processes as to factual sufficiency—an area that "has been the sole domain of the intermediate appellate courts in Texas since 1891." *See Keller*, 168 S.W.3d at 822; *Pool*, 715 S.W.2d at 635 ("It may well be that the court of appeals . . . considered and weighed all the evidence before arriving at a decision of insufficiency. But, without that mental process being reflected in the opinion, it is impossible for this [C]ourt to be certain that the requirements of *In Re King's Estate* have been followed."). Where a court of appeals purports to decide that the evidence is factually insufficient,

33

it errs when it does so without applying the factual sufficiency standard, detailing the evidence, and explaining its decision.

## V. Conclusion

We hold that the court of appeals erred in reversing the trial court. Although Dr. Parrish's testimony concerning the standard of care Dr. Kareh owed to Lance and whether Dr. Kareh's breach of that standard of care caused Lance's death was hardly supported by medical literature, it was not conclusory. The jury could reasonably find Dr. Parrish's opinion persuasive over other opinions, and we should not substitute our own judgment for the jury's. Further, any breach by Dr. Kareh of the standard of care would not be too remote for a reasonable jury to find proximate cause. Additionally, although the court of appeals identified the correct standard for factual sufficiency review, it failed to explain its application of that standard. Accordingly, we reverse the court of appeals' judgment and remand the case for the court of appeals to decide whether, in light of our holdings today, Windrum presented legally and, if necessary, factually sufficient testimony to support the jury's verdict.

_____
Paul W. Green
Justice

OPINION DELIVERED: January 25, 2019